UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO
CIVIL ACTION NO. 4:18CV-P24-JHM

**CARL LEE ADKINS, JR.**                                                    **PLAINTIFF**

**v.**

**LESTER LEWIS** *et al*.                                              **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on the motion for summary judgment filed by Defendants
DeEdra Hart, Felicia Howard, and Tina Moore (DN 54).  Proceeding *pro se*, Plaintiff filed a
response to the motion (DN 57).  Defendants did not file a reply.  For the reasons that follow, the
motion for summary judgment will be granted.

## I.  SUMMARY OF RELEVANT FACTS

This action arises out of Plaintiff's incarceration at the Green River Correctional
Complex (GRCC).  Upon initial review of the complaint pursuant to 28 U.S.C. § 1915A, the
Court allowed Plaintiff's individual-capacity claims alleging deliberate indifference to his safety
to proceed against Defendants GRCC Unit Administrator Howard, Warden Hart, Case and
Training Officer Moore and alleging retaliation against Defendant Howard.

In the verified complaint, Plaintiff maintained that he previously had foot surgery which
resulted in him "having a metal plate . . . screwed into the heel bone of [his] right foot."  Plaintiff
stated that he was transferred to GRCC on September 20, 2017.  He alleged that on
November 29, 2017, Defendant Howard told him to move to a dorm on an upper floor.  Plaintiff
stated that he explained to Defendant Howard that using stairs caused him pain in his foot and
further informed Defendant Howard that GRCC "medical staff prescribed Plaintiff a cane and
restricted Plaintiff to bottom bunk."  Plaintiff stated that he "implored . . . Defendant Howard to

not move Plaintiff to upper floor[]" but that she "refused to acknowledge Plaintiff's injury" and told him to move to the upper floor anyway.

Plaintiff maintained that on December 6, 2017, he wrote a letter to Defendant Hart stating that he had been erroneously moved to the upper floor and that the constant use of stairs caused him pain in his foot. Plaintiff stated that he requested that Defendant Hart move him to a lower floor but that she "refused to acknowledge the severity of Plaintiff predicament and ignored Plaintiff's request."

Plaintiff also stated that on December 8, 2017, four unknown officers came to his cell, cuffed him, and removed all of his personal and state-issued property. He stated, "The Plaintiff was told that his property was being taken per Defendant Howard's order. Plaintiff was advised that his property would not be returned until Defendant Howard was done with it." He maintained that he "was left without clean clothes, hygiene or correspondence materials for approximately three (3) days." He added that he "was not allowed to shower for approximately six (6) days prior to this due to the facility being on lock-down." Plaintiff stated that he was told by a former cell-mate "that all the Plaintiff's property was taken because Plaintiff was 'crazy' and 'keeps filing grievances.'" He reported that on December 11, 2017, his property was returned and that he "noticed that relevant legal materials were missing from his property."

Plaintiff further asserted that on December 25, 2017, he informed Defendant Moore of his medical condition and requested that he be housed on a bottom floor "as prescribed by Medical." Plaintiff stated that Defendant Moore told him to "wait until after the holidays to be moved."

Plaintiff alleged that on December 31, 2017, he fell down the stairs and "was rushed to the facility's medical unit" where he was "treated for head, foot, and leg injuries." He stated that

his right foot is "permanently bruised, swollen, and stiff" and that "the pain becomes so unbearable that he usually cannot walk." Plaintiff stated that "when he has severe pain, he becomes unable to flex his foot and when the pain lessens it can take up to an hour before he can walk again." Plaintiff maintained that, after his fall, he was moved to the bottom floor.

In their motion, Defendants argue that they are entitled to summary judgment on Plaintiff's claim for deliberate indifference to safety because he failed to satisfy either the objective or subjective standard for establishing a such a claim and that he failed to demonstrate any harm from the fall which would entitle him to damages. They also argue that Defendant Howard is entitled summary judgment on Plaintiff's retaliation claim because she did not order officers to confiscate his property; that Plaintiff failed to show that he was engaged in protected conduct because he did not identify a non-frivolous grievance which he filed; and that Plaintiff's property was not in fact taken.

The following is a description of Plaintiff's pertinent medical records as provided by Defendants in support of their motion for summary judgment.

On January 31, 2017, while housed at Kentucky State Penitentiary (KSP), Plaintiff was seen by Advanced Practice Registered Nurse (APRN) Karen Ramey for complaint of foot and ankle pain which Plaintiff reported had become worse in the last few months (DN 54, Exhibit (Ex.) 1, at 3-4). He also said that his pain "was aggravated by walking or standing for long periods of time. Alleviated by taking pressure off and NSAIDS." Plaintiff also stated that "he tries to jog in place for strengthening exercise." Ramey documented that Plaintiff was in no acute distress, that he could stand on his right tip-toes, that he did not sit, and had a slightly antalgic gait. She prescribed Indomethacin.[1]

---

[1] Indomethacin is a nonsteroidal anti-inflammatory drug, or NSAID. See https://www.webmd.com/drugs/2/drug-8880-4186/indomethacin-oral/indomethacin-oral-liquid/details.

Plaintiff was seen again by Ramey on March 28, 2017, because Plaintiff was "[r]equesting a cane due to heel pain" (*Id*. at 5-6). Plaintiff stated that he was having trouble with balance because of his foot pain and that he was "having trouble at different times usually when he first wakes up and with change of weather." Plaintiff requested a recommendation for a "bottom bunk, cane, and no stairs." Ramey noted that Plaintiff did not request a change to his medicine and that Plaintiff had no clubbing, cyanosis, or edema and was "ambulatory without assistive devices or help from staff." Ramey explained to Plaintiff that once he was transferred to a new facility, he would need to be evaluated by medical providers at that facility and they would determine what special recommendations, if any, were needed.

On May 4, 2017, Plaintiff was seen by Dr. Lester Lewis at KSP for complaint of "balance issues" (*Id*. at 8-9). Plaintiff reported that he had injured his right ankle in a fall at the age of 19 and that he had undergone "reconstructive surgery with plate and screws" in his ankle. He complained of "intermittent pains and instability of ank[l]e which causes him to lean against a wall or grab a banister." Plaintiff said he wanted to "get to a better facility" and mentioned "hills and steps." Dr. Lewis noted that Plaintiff's Achilles tendon was tender and causing pain. He determined that Plaintiff's right ankle needed to be assessed for degeneration and gave Plaintiff exercises to relieve tension and to improve the stability of his ankle.

On May 11, 2017, APRN Ramey reviewed an x-ray of Plaintiff's right ankle (*Id*. at 10-11). The x-ray revealed that Plaintiff's right ankle showed "no acute fracture or dislocation, osseous structures appeared intact, joint spaces were preserved, soft tissues were unremarkable. No acute osseous abnormality."

On May 17, 2017, Dr. Lewis saw Plaintiff for assessment of his foot pain (*Id*. at 12-13). Plaintiff stated that he had pain with ambulation that "was aggravated by having to walk up and

down the terrain at KSP." Dr. Lewis documented that he had seen Plaintiff on three occasions

and concluded that Plaintiff had "chronic shortening of the Achilles tendon" that could be

aggravated by inclines and steps. Dr. Lewis observed that Plaintiff's ankle and foot pain were

from his prior injury that was worsening over time due to degenerative changes. Dr. Lewis

determined that once Plaintiff was out of segregation he might need a cane, but that since it

represented a security risk, Plaintiff's possible need would have to be balanced with "safety due

to his volatility." Dr. Lewis also noted "needs xray of right foot."

On July 27, 2017, Dr. Lewis saw Plaintiff for his complaint that he wanted a transfer

"due to foot injury which is permanent and has pain with terrain" (*Id*. at 16-17). Plaintiff stated

that he had "stiffness and pain worse in morning and improves during day with movement but is

still painful." Plaintiff reported that he had been approved for a cane by Denise Burkett in

response to a grievance. In the treatment plan section of the note, Dr. Lewis documented

Plaintiff would "[a]wait a response on the cane."

On September 7, 2017, Plaintiff was seen by medical provider Robert Rozefort for his

complaint of foot pain (*Id*. at 18-19). Rozefort documented that Plaintiff's right foot looked

normal except for a surgical scar at the ankle and that there was no local swelling or tenderness

and that mobility of the foot and ankle were normal. Rozefort documented, "No intervention

[was] necessary other than to continue present pain medication and follow-up as needed."

On September 14, 2017, Plaintiff was again seen by Rozefort for complaint of foot pain

(*Id*. at 20-21). Rozefort documented, "Pain is said to be constant but gets aggravated with

ambulation." Rozefort further noted that Plaintiff was currently on pain medication but was

requesting that his pain medication be "upgraded to Neurontin." Rozefort stated, "There is no

swelling and no tenderness at any level, and all movements of flexion, extension, and

lateralization of the R foot were normal, unimpaired."  Rozefort further stated, "Examination fails to show evidence to support the complaints and a need for treatment with Neurontin."

On September 20, 2017, Plaintiff was transferred to GRCC and underwent a medical intake screening (*Id*. at 22-23).

On September 24, 2017, Plaintiff was seen by provider Lessye Crafton for a  complaint that he wanted a cane and "BB" [bottom bunk] (*Id*. at 24).  In regards to the medication that Dr. Lewis had prescribed previously, Plaintiff stated, "I'll be honest, I haven't been taking it cause I can't stand in the line."  Plaintiff was counseled on the importance of taking medication as prescribed.  The provider documented that Plaintiff could bear his full weight with "moderate limp right side."  Plaintiff was requesting a walking cane and bottom bunk and wanted to discuss the possibility of undergoing physical therapy with a provider.

On September 25, 2017, Plaintiff was seen by provider Rozefort for complaint of wanting a bottom bunk, cane, and physical therapy (*Id*. at 25-26).  Plaintiff had continued right foot pain and felt he would benefit from the use of a cane since his pain tended to be aggravated with ambulation.  Rozefort noted that Plaintiff was in no acute distress and ambulated comfortably with a slight limp and had slight tenderness of the soft tissues with no local swelling.  The treatment plan included prescribing Plaintiff a cane and bottom bunk for two months.

On December 8, 2017, medical provider Crafton saw Plaintiff because he was wanting to know the status of physical therapy and wanting bottom floor status (*Id*. at 28-29).  Crafton noted that Plaintiff "[s]aw Dr. Younger on 11/24/17 and was advised that he would request physical therapy of which has not been requested at this time as GRCC does not have physical therapy here."  Crafton also documented that Plaintiff ambulated into the exam room without difficulty with his cane, which he was using incorrectly.  Crafton encouraged proper use of his cane;

advised Plaintiff to buy pain medications from the canteen as needed and to do range of motion
[ROM] strengthening exercises; and advised him that she would check into physical therapy with
the provider.

In a second Progress Note dated December 8, 2017, pertaining to Plaintiff's request for
bottom floor and questions about physical therapy, Crafton documented that Plaintiff "[r]eports
that pain in left heel/ankle post fall.  Foot drop noted.  Walks with cane.  Already has BB order
and Cane and is requesting Bottom Floor" (*Id*. at 30-31).  She also noted, "[F]oot drop and
weakness noted to right foot, wa[l]ks with cane and limp, steady walking with cane."  Crafton
further documented, "Patient given bottom floor with same end date as bottom bunk."  That
Progress Note includes an "Addendum" dated January 25, 2018, which states, "Younger, Kevin>
Per discussion with nursing staff and security, it has been noted that pt is not utilizing his cane
correctly and has been noted as slow running down the loop.  No physical therapy will be
pursued at this time.  May continue ROM exercises, can[e], and analgesics from canteen."

On December 12, 2017, Plaintiff was seen by provider Crafton (*Id*. at 32).  The reason for
the visit was documented as "Amb[]ulating well."  Plaintiff stated, "I was told to come to
medical I don't know why."  Crafton documented, "Patient ambulating well with no limp
without his cane."

On December 31, 2017, Plaintiff was seen by provider Crafton after his fall (*Id*. at 33-
34).  Crafton documented that Plaintiff stated, "I was coming down the stairs and I tripped over
my cane.  I'm slightly dizzy and lightheaded."  She also documented that the dorm officer
reported that Plaintiff "fell down 2 steps" and that Plaintiff reported hitting his head.  Crafton
documented, "Slight puffiness to the right side head.  Skin intact.  No discoloration.  Soft tissue
swelling to top of right ankle."  Crafton also observed that 36 minutes after arriving at the

medical unit, Plaintiff reported that he was not dizzy or lightheaded anymore and that there was no loss of consciousness.  She also stated, "Noted in patient chart, patient is BB/BF.  Security made aware.  Advised per Lt. Carey that patient will be reassigned to bottom floor today."  Crafton also documented, "Neuro checks, applied ACE wrap, issued crutches, instructed on resting ankle, apply cool compresses for 15 minutes Q 1 hour while awake, purchase Ibuprofen from canteen for pain if needed.  Patient advised to go through sick call if ankle continues to have discomfort or swelling. . . . Patient instructed to return these items to medical 1/3/17."

On January 25, 2018, medical provider Tonya Gray saw Plaintiff for his complaint of "[q]uestions about physical therapy" (*Id*. at 35).  It was noted that after reviewing Plaintiff's chart, "Per Dr. Younger's order.  PT is not indicated at this time (see 12/28/17 addendum).  Pt. to purchase canteen analgesics for PRN pain."

On February 5, 2018, medical provider Crafton saw Plaintiff listing as his chief complaint "Med noncompliance counseling" (*Id*. at 36).  Crafton documented the following:

> Medication noncompliance counseling regarding patient noncompliant with taking Indomethacin et Amlodipine.  Patient stated "I'm gonna be honest with you.  I'm real tired to come over here and the pain, it's real painful to walk over here, especially in the cold."  Discussed with patient benefits vs risks of not taking Indomethacin for foot pain et Amlodipine for [blood pressure].  Patient verbalized understanding stated "I will start trying to do better."  Patient signed refusal form for missed doses.

On March 10, 2018, Plaintiff was seen by Crafton for complaint of right foot/ankle pain. (*Id*. at 37-38).  Crafton noted that Plaintiff's ankle showed a quarter-sized bruise and swelling.  Plaintiff stated that "he was placed in shackles on March 4th, and has had issues since."  Crafton documented, "Action/plan refer to provider."

On March 15, 2018, Dr. Lewis saw Plaintiff for complaint of foot and ankle pain (*Id*. at 39-40).  Dr. Lewis documented that Plaintiff had "discomfort only with walking and only

without a cane.  No current medications except [blood pressure] meds."  Dr. Lewis also noted

that Plaintiff had been previously approved for a cane "despite prolonged period after surgery."

Dr. Lewis restarted Plaintiff's prescription for Indomethacin and noted that Plaintiff was again

requesting physical therapy but determined that "at this stage self directed program is option."

On April 3, 2018, Plaintiff was seen by medical provider Brianna Capel because he had

been assigned to the Restrictive Housing Unit (*Id*. at 41).  It was documented that Plaintiff

"denies pain, questions, or concerns at this present time."

On May 10, 2018, Plaintiff was seen by Crafton for a "Sick Call" (*Id*. at 42-43).  Crafton

documented that Plaintiff "expresses desire for bottom bunk, bottom floor, and cane to be

renewed.  Denies pain at this present time.  Will refer to provider for further treatment and

evaluation."

On May 11, 2018, Plaintiff was seen by Crafton for a complaint of hypertension (*Id*. at

44-45).  During that visit, Crafton documented that Plaintiff was "walking well and holding cane

in hand, not utiliz[ing] cane or need to utilize."

On May 30, 2018, Dr. Lewis saw Plaintiff for issues unrelated to his foot/ankle (*Id*. at 46-

47).  However, Dr. Lewis documented that Plaintiff asked again about renewing his cane and

bottom bunk restrictions.  Dr. Lewis documented, "Was given cane in September by a

Locums physician who did not explain what the findings were to warrant these restrictions.  Will

not renew need for cane or bottom bunk."  Dr. Lewis made an "Addendum" to the Progress

Note, also dated May 30, 2018, stating "Removed all restrictions for this individual to inc[l]ude

bottom floor, bottom bunk, cane, crutches and ACE bandage.  Problem he cites[]was from 2004

with no new injuries since that time."

On November 12, 2018, Plaintiff was seen by Nurse Practitioner Mary Nolan for an annual physical and chronic care appointment (*Id*. at 48-50).  Nolan documented, "Requesting BB and bottom floor for right foot pain.  Advised did not meet criteria for BB and bottom floor.  Take meds as prescribed for right foot pain."  In evaluating Plaintiff's extremities, it was noted, "no clubbing, cyanosis, edema, +2 distal pulses throughout."

Defendants also attach affidavits and grievance records which will be addressed in pertinent part below.

In response to the motion, Plaintiff does not dispute the medical records produced by Defendants.  He attaches to his response only two medical records which were not produced by Defendants in support of the motion for summary judgment.  The first is a document titled "Special Needs Form" dated December 31, 2017, signed by Tina Johnson (DN 57, Ex. 3).  It states, "I have reviewed the patient's record and I have found that patient will need the following Special Needs/Special Requirements[:] 1. Special Housing: Bottom Bunk (09/25/2017-05/31/2018)[;] 2. Special Housing: Bottom Floor (12/08/2017-05/31/2018)."  The second medical record Plaintiff attaches which is not also attached to Defendants' motion, is a Final X-ray Report signed by KSP medical provider Dr. Dennis Burton on September 25, 2015 (*Id*., Ex. 6).  The exam reason is documented as "ANKLE/FOOT DERANGEMENT" and "PAIN IN JOINT, ANKLE AND FOOT."  The report lists the "Impression" as "POSTOPERATIVE/DEGENERATIVE CHANGE[;] NO ACUTE INJURY."

Plaintiff also attaches to his response an Incident Report Summary dated December 31, 2017, concerning Plaintiff's fall. (*Id*., Ex. 5).  Included in the report is the following statement by Corrections Officer Chris Choate:

> On December 31st, 2017 at approximately 10:56 a.m., I . . . witnessed [Plaintiff] fall down approximately 2-3 steps at the bottom of the stair case on the right side

of the dayroom of Dorm #1.  I . . . then announced via institutional radio channel #1 that there was a medical emergency in Dorm #1.  At 10:58 a.m., Sergeant Donnie Cox and Officer Nathaniel Dennison arrived in Dorm #1.  At 11:04 a.m., Nurse Tina Johnson arrived in Dorm #1.  At 11:08 a.m., Officer Nathaniel Dennison and Nurse Tina Johnson exit Dorm #1 with [Plaintiff].

Plaintiff also attaches grievance records which will be addressed in pertinent part below.

Defendants did not file a reply.

## II.  LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support an essential element of the nonmoving party's case for which he has the burden of proof.  *Id.*  Once the moving party demonstrates this lack of evidence, the burden passes to the nonmoving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof.  *Id*.  If the record taken as a whole could not lead the trier of fact to find for the nonmoving party, the motion for summary judgment should be granted.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Where the nonmoving party bears the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.  The nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury.  *Lucas v. Leaseway Multi Transp.*

*Serv., Inc.*, 738 F. Supp. 214, 217 (E.D. Mich. 1990).  If the non-moving party fails to do so, the moving party is "entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof."  *Id.* (internal quotation marks omitted).

### III.  ANALYSIS

#### A.  Deliberate-indifference-to-safety claim

The Eighth Amendment requires that prison officials "take reasonable measures to guarantee the safety of the inmates."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  To establish an Eighth Amendment claim against prison officials based on their failure to protect the plaintiff from harm, a plaintiff must present evidence showing that the defendant's conduct amounted to "deliberate indifference" to a known risk of harm.  *Id.* at 837; *see also Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997).  "The Eighth Amendment protects prisoners only from that conduct which is 'repugnant to the conscience of mankind.'"  *Rafferty v. Trumbull Cty., Ohio*, 915 F.3d 1087, 1094 (6th Cir. 2019) (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010)).  Only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.  *Id.* (quoting Farmer, 511 U.S. at 834).  Deliberate indifference is equivalent to criminal recklessness.  *Farmer*, 511 U.S. at 839-40.  The plaintiff "must demonstrate deliberateness tantamount to intent to punish."  *Horn by Parks v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994).

Deliberate indifference includes both objective and subjective elements.  *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001); *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011).  The objective element requires the harm to be "sufficiently serious."  *Curry*, 249 F.3d at 506 (quoting *Farmer*, 511 U.S. at 834).  Therefore, "the inmate must show that he is incarcerated under

conditions posing a substantial risk of serious harm." *Id.* The subjective element focuses on whether prison officials know that inmates face a substantial risk of harm and "disregard[] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Prison officials must exhibit more than lack of due care for a prisoner's safety before an Eighth Amendment violation will be found. *Id.* at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. It is not enough that the official "should" have perceived a significant risk but did not. *Id.*

### 1. Objective prong

Defendants argue that Plaintiff has not met the objective prong of the analysis because his medical records show that he "was never medically restricted to bottom floor prior to his alleged fall on December 31, 2017." They maintain that Plaintiff's "medical records are devoid of any indication that he was medically restricted to bottom floor, save the December 8 medical note . . ., after he was moved to the upper floor." Defendants argue that Plaintiff's assertions that he told Defendants that stairs hurt his ankle "are nothing more than his own subjective conclusion that he should have been medically restricted to bottom floor."

Plaintiff's medical records show that he made repeated complaints of foot and ankle pain starting in at least January 2017 before his fall on December 31, 2017. For the purposes of ruling on the instant motion, the Court will assume, without making a conclusion on the merits, that Plaintiff has stated a sufficiently serious medical need to satisfy the objective prong of the deliberate-indifference standard.

## 2. Subjective prong

With regard to the subjective prong of the analysis, Defendants argue that Plaintiff has failed to demonstrate that Defendant Hart, Howard, or Moore perceived a substantial risk to his safety and ignored it.  The Court will analyze the allegations against each Defendant in turn.

### a. Defendant Howard

According to the verified complaint, Defendant Howard told Plaintiff to move to a dorm on an upper floor on November 29, 2017.  Plaintiff stated that he explained to Defendant Howard that using stairs caused him pain in his foot and further informed Defendant Howard that GRCC "medical staff prescribed Plaintiff a cane and restricted Plaintiff to bottom bunk."  Plaintiff stated that he "implored . . . Defendant Howard to not move Plaintiff to upper floor[]" but that she "refused to acknowledge Plaintiff's injury" and told him to move to the upper floor anyway.

In support of the motion for summary judgment, Defendants attach the affidavit of Defendant Howard.  Defendant Howard does not dispute that she approved Plaintiff's move to an upper floor on November 29, 2017, or that Plaintiff complained about the move "because he said he had an old ankle injury and the move would require him to use the stairs."  (DN 54, Ex. 5).  She avers that the GRCC medical department maintains a list of inmates who are medically restricted to a bottom bunk and/or bottom floor.  She states, "Any such restriction is a medical decision.  Only qualified medical personnel add or remove inmates from the lists of inmates who are medically restricted to bottom bunk and/or bottom floor."  (*Id.*)  She avers that she was not a medical clinician and could not make the medical decision concerning Plaintiff's need for a medical restriction.

14

Defendant Howard further states in her affidavit, "Whenever I approve a cell move, I check the medical department's list of inmates who are bottom bunk and/or bottom floor restricted for medical reasons.  And I rely upon that list to inform me of which inmates have such restrictions."  (*Id.*)  She avers that she checked the list for inmates restricted to the bottom floor and/or bunk and Plaintiff's name was not listed.  She states that he was assigned to a bottom bunk in compliance with the listed medical restriction.  She also avers, "When Adkins complained to me about the move, I advised him that if he thought he should also be bottom floor restricted, he would have to go to medical and the medical department would make the determination of whether he should also be bottom floor restricted, because only medical could change his status."  She also states that she "never witnessed Adkins having any difficulty with ambulation that gave me reason to think he had medical problems that were not being addressed by the medical department."

Defendants argue, and the Court agrees, that prison administrators, such as Defendant Howard, may rely on the medical judgment of a prison's medical staff.  *See Hubble v. Cty. of Macomb*, No. 2:16-CV-13504, 2019 U.S. Dist. LEXIS 68465, at *15 (E.D. Mich. Apr. 23, 2019) ("Corrections officers are entitled to rely on the medical judgment of prison healthcare providers and 'commit[ ] no act of deliberate indifference in adhering to [the] advice' of a medical professional because 'nonmedical jail personnel are entitled to reasonably rely on the assessments made by the medical staff.'") (quoting *Winkler v. Madison Cty.*, 893 F.3d 877, 890-91 (6th Cir. 2018)); *see also Hamilton v. Pike Cty., Ky.*, No. 11-99, 2013 U.S. Dist. LEXIS 18317, at *22 (E.D. Ky. Feb. 11, 2013) ("Non-medical prison officials, such as Jailer Scott, act reasonably when they rely on the judgment of the prison medical staff.") (collecting circuit cases holding same).

There is no dispute that, at the time Plaintiff asked Defendant Howard that he not be moved to an upper floor on November 27, 2017, Plaintiff did not have a medical restriction for placement on a lower floor.  Defendant Hart was entitled to rely on the medical judgments made by medical staff in not assigning him to a lower level.  *See Hubble*, 2019 U.S. Dist. LEXIS 68465, at \*15.  A Progress Note dated December 8, 2017, indicates that Plaintiff was given a lower floor restriction on that date.  However, Plaintiff does not allege that he went back to Defendant Howard to show her documentation of the lower floor restriction.  Unfortunately, Plaintiff suffered an accidental fall on December 31, 2017.  However, "[a]n accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain." *Robbins v. Black*, 351 F. App'x 58, 62 (6th Cir. 2009) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)).

In *Robbins*, the inmate alleged deliberate indifference when his request for a bottom bunk was denied.  *Id.* at 60.  Plaintiff suffered a fall and sued medical and non-medical personnel and the Sixth Circuit affirmed summary judgment against both.  *Id.*  With regard to the prison medical personnel, the Sixth Circuit found that "Dr. Fleming had examined [the plaintiff] and concluded that his condition did not mandate assignment to a bottom bunk.  Because [the plaintiff] was not entitled to a bottom bunk under established prison-wide policy, it is highly unlikely that Robbins's top-bunk placement resulted from ill-will toward him individually." *Id.* at 63.  Similarly, with regard to the non-medical personnel, the Sixth Circuit concluded, "Just as there is no evidence that Dr. Fleming was derelict in his duties, there is no evidence that non-medical staff 'had reason to know otherwise.'  They were therefore entitled to follow his recommendation that Robbins did not medically require a bottom bunk." *Id.* (quoting *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1248-50 (6th Cir. 1989)).

The Court finds that Plaintiff has not demonstrated that Defendant Howard, in deferring to the medical judgment of the GRCC medical personnel, had a subjective knowledge of the risk to Plaintiff "tantamount to intent to punish" in approving his move to a lower level.  *Horn by Parks*, 22 F.3d at 660.  Therefore, Defendant Howard is entitled to summary judgment on the deliberate-indifference claim.

### b.  Defendant Hart

Against Defendant Hart, Plaintiff alleges in the verified complaint that on December 6, 2017, he wrote a letter to her stating that he had been erroneously moved to the upper floor and that the constant use of stairs caused him pain in his foot.  Plaintiff stated that he requested that Defendant Hart move him to a lower floor but that she "refused to acknowledge the severity of Plaintiff predicament and ignored Plaintiff's request."

Defendant Hart also attaches an affidavit in support of the motion for summary judgment, in which she avers the following:

> With regard to Adkins's assertion that he wrote me a letter on December 6, 2017 complaining of his move to an upper floor, I cannot recall whether Adkins wrote me such a letter.  Typically, however, while I was Warden of GRCC, letters from inmates concerning medical issues were forwarded to the Deputy Warden of Programs/Operations for review.  But, assuming Adkins sent me such a letter, neither I nor the Deputy Warden of Programs/Operations could have provided Adkins with any response other than what I advised him in his grievance, *i.e.*, that if he thought he should be medically restricted to bottom floor, he would need to see his medical provider to have his status changed.

(DN 54, Ex. 4).  Furthermore, like Defendant Howard, Defendant Hart avers that she is not a medical clinician and does not have necessary training and expertise to determine how an inmate's complaint of pain or ankle pain should be treated or whether the inmate should be restricted to a bottom bunk and/or floor.  She states that as Warden she relied on the medical personnel to make such determinations.

Even assuming Defendant Hart read Plaintiff's letter requesting to be moved to a lower floor on December 6, 2017, there is no dispute that he did not have a medical restriction to a lower level on that date. Defendant Hart, like Howard, was entitled to rely on the medical judgment made by prison medical personnel. *See Hubble*, 2019 U.S. Dist. LEXIS 68465, at *15. While Plaintiff's medical records indicate that he was given a bottom floor restriction on December 8, 2017, Plaintiff does not allege that he informed Defendant Hart of this.

Upon review, Plaintiff has not demonstrated that Defendant Howard, in deferring to the medical judgment of the prison medical personnel, had a subjective knowledge of a substantial risk to Plaintiff. Therefore, Defendant Hart is also entitled to summary judgment.

**c. Defendant Moore**

With regard to Defendant Moore, Plaintiff alleged in the verified complaint that on December 25, 2017, he informed Defendant Moore of his medical condition and requested that he be housed on a bottom floor "as prescribed by Medical." Plaintiff stated that Defendant Moore told him to "wait until after the holidays to be moved."

In support of summary judgment, Defendant Moore also attaches her affidavit. She avers, "I have no recollection of Adkins telling me, on December 25, 2017, or any other date, that he had a medical condition that required him to be housed on a bottom floor. And there is no reason why he should have approached me about this issue, because I was not his CTO." (DN 54, Ex. 6). She states that with regard to Plaintiff's allegation that he requested to be moved on December 25th, "CTOs do not do bed moves unless authorized by a Unit Administrator to do so. The Unit Administrator would then have to approve the particular bed move the CTO contemplated making. And the appropriate Deputy Warden, or their designee, would have to give final approval." (*Id.*). She continues, "Therefore, if [Plaintiff] had informed me, or any

18

CTO, that he was improperly housed, neither I, nor any other CTO, would have had the unilateral authority to change his bed assignment.  And it is unlikely that the Unit Administrators and Deputy Warden would have been at GRCC on Christmas Day."  (*Id*.).

Defendant Moore further avers that the medical department maintains a list of inmates who are currently restricted to a bottom bunk and/or floor and that they are placed there for medical reasons.  She maintains that, as a CTO, she did not have control over or the medical expertise to determine who was placed on the list.  Defendant Moore avers, "Therefore, at any time that I had any involvement with arranging bed moves, I checked, and relied on, the list of inmates who were medically restricted to bottom bunk and/or bottom floor to determine where an inmate could be housed."  (*Id.*).   She further states in the affidavit as follows:

> If Adkins had informed me that he were improperly housed on an upper floor, in contradiction of medical restriction, I would not have simply ignored him.  I would have checked his bed assignment and the medical department's list of inmates who were then medically restricted to bottom bunk and/or bottom floor to see if Adkins's assertion were true.  And if that investigation revealed that he was improperly housed, I would have brought the issue to the attention of the appropriate Unit Administrator so that corrective action could be taken. . . . Furthermore, if I had witnessed Adkins having problems with ambulation so pronounced as to cause me concern for his ability to ambulate or for his safety, I would have notified the medical department so he could be immediately assessed.

(*Id.*).

Unlike the requests made to Defendants Howard and Hart, Plaintiff did have a medical restriction for a lower level at the time he made the request to be housed on the bottom floor to Defendant Moore.  The issue the Court must examine, however, is not the assignment to the upper floor itself, but whether Defendant Moore was deliberately indifferent to Plaintiff's substantial risk of serious harm.  *See Millhouse v. Jones*, No. 6:18-CV-125-DLB-HAI, 2020 U.S. Dist. LEXIS 38842, at *14-15 (E.D. Ky. Jan. 30, 2020) (finding that "[t]he issue is not whether Defendants made the decision to assign Plaintiff an upper bunk, but whether Defendants were

deliberately indifferent to a serious medical need Plaintiff was experiencing" and affirming summary judgment for defendants in claim by inmate that defendants failed to honor his lower bunk restriction resulting in fall) (internal quotation marks and citation omitted), *report and recommendation adopted*, 2020 U.S. Dist. LEXIS 37375 (E.D. Ky. Mar. 4, 2020).

In another case decided by the Eastern District of Kentucky, an inmate had been authorized for a transfer to a single-level prison due to his inability to navigate stairs. *Wells v. Conrotto*, No. 0:14-CV-33-HRW-REW, 2015 U.S. Dist. LEXIS 191077, at *2 (E.D. Ky. Nov. 17, 2015), *report and recommendation adopted*, 2015 U.S. Dist. LEXIS 191151 (E.D. Ky. Dec. 9, 2015). The plaintiff claimed that the defendants, a doctor and a nurse, were deliberately indifferent to his medical conditions when they moved him to an upper-level dorm and canceled the authorization of his transfer to a single-level prison, which the plaintiff alleged ultimately resulted in his fall down 10-12 stairs. *Id.* at 3-4.

The Eastern District granted summary judgment to the defendants and found that the plaintiff had failed to show that the defendants met the subjective prong of a deliberate-indifference claim. *Id.* at 24. The Court found that the Sixth Circuit "has emphasized that a plaintiff must produce evidence showing that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.* at *10-11 (citing *Perez v. Oakland Cty.*, 466 F.3d 416, 424 (6th Cir. 2006); *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014)). As to the defendant nurse, the court stated that she had offered an "ultimatum" to the plaintiff, to either accept the upper level assignment or to be placed in segregation. *Id.* at 13. The court found that the nurse's conduct "evidences nothing more than possible bureaucratic rigidity, not reckless disregard of a perceived substantial risk of serious harm." *Id.* at 14. The court further found that

the defendants "made judgments about [the plaintiff's] status that might be debatable but at most rise to nothing more than arguable negligence, an area well below the threshold for liability in this matter." *Id.* at 23.

Similarly, assuming that Plaintiff did in fact make a request to Defendant Moore that he be moved, her affidavit shows that she was unable to unilaterally order Plaintiff to be assigned to a bottom floor and would have had to receive approval from her superiors, who were not likely present at GRCC on the day Plaintiff made the request, Christmas Day.  Plaintiff's own allegation is that Defendant Moore did not refuse his request but told him to wait "until after the holidays."  The Court finds that, while this may reflect "bureaucratic rigidity" on the part of Defendant Moore, it does not reflect she was subjectively aware of a substantial risk to Plaintiff and disregarded it. *See id.* at 14.

Plaintiff's medical records also bear on Defendant Moore's subjective awareness of a risk to Plaintiff.  In the month of December, Plaintiff's medical records show that he had two visits to the medical unit, on December 8, 2017, and December 12, 2017.  Therefore, it is clear that Plaintiff's medical needs were not going unaddressed or ignored.  He was seen regularly for his foot and ankle pain by medical; he was prescribed a cane and medication for pain: and his restriction to a lower bunk was observed.  Indeed, in her affidavit Defendant Moore avers that "if I had witnessed Adkins having problems with ambulation so pronounced as to cause me concern for his ability to ambulate or for his safety, I would have notified the medical department so he could be immediately assessed."  Plaintiff offers no evidence to dispute this.

Moreover, Plaintiff does not allege that Defendant Moore had any involvement in his fall leading to his injury.  As the Eastern District of Kentucky observed in *Wells*:

> [R]egarding Wells's fall down 10-12 stairs—Wells makes no allegations of either
> [of the defendants'] personal involvement in the incident.  "An accident, although

> it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain." *Estelle*, [429 U.S. at 260]. Instead, Wells appears to allege the incident was the result of Defendants' prior actions and, ultimately, was the cause of the injury about which he complains. He utterly fails to show, however, that either [of the defendants] inflicted pain—much less unnecessary and wanton pain—on him, or recklessly perceived and disregarded a substantial risk of serious harm to him, when his hip gave out and he fell down stairs. He promptly received medical attention, about which he does not complain, following the incident.

*Id.* at *16-18. Plaintiff does not allege that Defendant Moore was involved or even present on the day of his fall. Further, Plaintiff's medical records show that he received immediate medical attention after the fall, about which he does not complain, and was promptly moved to a bottom floor after the fall.

It is also worth noting that Plaintiff's medical records following the fall on December 31, 2017, which Plaintiff does not dispute, document that the dorm officer reported that Plaintiff fell down 1-2 steps. In an Incident Report, which Plaintiff attached to his response to the motion for summary judgment, a corrections officer said Plaintiff fell down 2-3 stairs. The Court finds that Plaintiff's fall down 1-3 stairs does not support Plaintiff's allegation of a permanent injury from the fall, separate from the foot and ankle pain he had experienced as a result of his foot surgery years earlier. Moreover, Plaintiff's allegation of permanent injury and "severe pain" as a result of the fall are wholly unsupported by his medical records for the months after his fall. None of the medical records after December 31, 2017, show that Plaintiff complained about injuries from the fall itself. As soon as January 25, 2018, less than a month after the fall, Plaintiff saw medical provider Glover, who did not document any complaints of pain due to the fall but documented that physical therapy was not needed and that his pain could be treated with analgesics purchased from the canteen. Five months after his fall, on May 30, 2018, in regards to Plaintiff's foot and ankle issues, Dr. Lewis documented that the "[p]roblem he cites[]was from 2004 with no new

injuries since that time." At that time, Dr. Lewis removed all restrictions including bottom floor, bottom bunk, cane, crutches. and ACE bandage.

For these reasons, the Court find that Plaintiff has failed to show that Defendant Moore had a subjective knowledge of a substantial risk to Plaintiff and recklessly disregarded it "tantamount to intent to punish." *Horn by Parks*, 22 F.3d at 660. Therefore, Defendant Moore is also entitled to summary judgment.

## B.  Retaliation claim

Retaliation based upon a prisoner's exercise of his constitutional rights violates the Constitution. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that:  (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id*. A plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

It is well recognized that retaliation is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987). "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice.");
*Skinner v. Bolden*, 89 F. App'x 579, 579-80 (6th Cir. 2004) (without more, conclusory
allegations of temporal proximity are not sufficient to show a retaliatory motive).  "[B]ecause
prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of
unwarranted judicial intrusion into matters of general prison administration, we are careful to
require non-conclusory allegations."  *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)
(internal quotation marks omitted).

      Plaintiff alleged that on December 8, 2017, four officers removed his property from his
cell and told him that his property was being taken on Defendant Howard's order and "would not
be returned until Defendant Howard was done with it."  Plaintiff stated that he was told by a
former cell-mate "that all the Plaintiff's property was taken because Plaintiff was 'crazy' and
'keeps filing grievances.'"  He reported that on December 11, 2017, his property was returned
and that he "noticed that relevant legal materials were missing from his property."

      For the purposes of the motion for summary judgment, the Court accepts that Plaintiff
has met the first two elements of a retaliation claim and will focus on whether the alleged
protected conduct–the filing of a grievance–was substantial or motivating factor in the alleged
adverse action–the removal of Plaintiff's property.  While the four officers may have confiscated
Plaintiff's property on the order of Defendant Howard, Plaintiff must still present evidence that
Defendant Howard was motivated to do so by Plaintiff's grievance.

      In Defendant Howard's affidavit attached to the motion, she avers, "On December 8,
2017, I had no knowledge about Adkins's grievances.  I do not process inmate grievances.
[GRCC] has a grievance coordinator who does that.  I had no knowledge of whether Adkins had
filed any grievances as of December 8, 2017, let alone against whom or for what reason."

In his unsworn response to the motion for summary judgment, Plaintiff maintains that "the grievance filed against [Defendant Howard] was answered on the date of confiscation which supports Plaintiff's claim of retaliation.  []The grievance was answered on December 8, 2017, the same day Plaintiff's property was taken . . . ."  He points to the date of signature of the grievance aide, whose last name is Yates, in the grievance form's "Informal Resolution Stage" section, attached to his response.  (DN 57, Ex. 8).  The narrative portion of that section denying Plaintiff's grievance was signed by Unit Administrator Darrell Wheeler on December 5, 2017.  However, Plaintiff offers no evidence that Defendant Howard was ever aware that Plaintiff had filed a grievance concerning his move to an upper level dorm.  In some circumstances, temporal proximity "may be 'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.'"  *Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004)).  However, temporal proximity alone is sufficient to create an issue of fact as to retaliatory motive.  *Brandon v. Bergh*, No. 2:08-CV-152, 2010 U.S. Dist. LEXIS 3507, at *4 (W.D. Mich. Jan. 16, 2010); *see also Skinner v. Bolden*, 89 F. App'x 579, 580 (6th Cir. 2004) ("[c]onclusory allegations of temporal proximity are not sufficient to show a retaliatory motive").  While the signature by Grievance Aide Yates may have temporal proximity to the alleged adverse action, Plaintiff offers no evidence to refute Defendant Howard's sworn affidavit stating that she had no knowledge of the grievance.

Plaintiff's only other allegation supporting a retaliatory motive is his assertion in the verified complaint that an unnamed inmate told Plaintiff that his property was taken because Plaintiff was "'crazy'" and "'keeps filing grievances.'"  However, he offers no evidence to support the allegation, such as an affidavit from the other inmate, and gives no reason to indicate

why the inmate would have knowledge of Defendant Howard's motivations.  Again, "conclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580.

Accordingly, the Court finds that Plaintiff has failed to demonstrate a retaliatory motive on the part of Defendant Howard.  Therefore, the motion for summary judgment will be granted with respect to the retaliation claim.

## IV.  CONCLUSION

For the reasons stated above, **IT IS ORDERED** that Defendants' motion for summary judgment (DN 54) is **GRANTED**.

Date:   September 28, 2020

Joseph H. McKinley Jr., Senior Judge
United States District Court

cc:     Plaintiff, *pro se*
        Counsel of record
4414.010